THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: August 10, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*The Brooklyn Brewery Corporation*

*v.*

*Brooklyn Brew Shop, LLC*
_____

Opposition No. 91223982[1]
Cancellation No. 92062838
_____

John J. Dabney of McDermott Will & Emery LLP
    for The Brooklyn Brewery Corporation.

Charles Hoffmann of Hoffmann Marshall Strong LLP
    for Brooklyn Brew Shop, LLC.

_____

Before Kuhlke, Shaw and Heasley,
    Administrative Trademark Judges.

Opinion by Shaw, Administrative Trademark Judge:

Brooklyn Brew Shop, LLC ("Defendant") owns a registration on the Principal

Register for the mark BROOKLYN BREW SHOP, in standard characters

(BROOKLYN BREW disclaimed), for goods identified as a "Beer making kit" in

---

[1] Opposition No. 91223982 was consolidated with Cancellation No. 92062838 by Board order dated March 2, 2016. See 9 TTABVUE in Opposition No. 91223982. All TTABVUE citations in this decision reference the docket in the parent case, i.e., Opposition No. 91223982.

Opposition No. 91223982 and Cancellation No. 92062838

International Class 32,[2] and seeks registration of the stylized mark

**Brooklyn BrewShop** (BREWSHOP disclaimed) for goods identified as:

> Sanitizing preparations for household use, in International Class 5;
>
> Beverage glassware; Coasters, not of paper and other than table linen, in International Class 21; and
>
> Alcohol-free beers; Beer; Beer making kit; Beer wort; Beer, ale and lager; Beer, ale and porter; Beer, ale, lager, stout and porter; Beer, ale, lager, stout, porter, shandy; Beer-based cocktails; Black beer; Brewed malt-based alcoholic beverage in the nature of a beer; Coffee-flavored beer; De-alcoholised beer; Extracts of hops for making beer; Flavored beers; Ginger beer; Hop extracts for manufacturing beer; Imitation beer; Malt beer; Malt extracts for making beer; Malt liquor; Non-alcoholic beer; Non-alcoholic beer flavored beverages; Pale beer; Porter; Processed hops for use in making beer; Root beer, in International Class 32.[3]

---

[2] Registration No. 4034439, issued October 4, 2011 from an application filed on February 18, 2011, Section 8 affidavit filed and accepted.

[3] Application Serial No. 86280776, filed May 14, 2014 under Trademark Act Section 1(a), 15 U.S.C. § 1051(a); alleging a date of first use of the mark anywhere on the goods in class 5 as of July 12, 2012 and a date of first use in commerce as of September 27, 2012; alleging a date of first use of the mark anywhere and in commerce on the goods in class 21 as of November 6, 2011; and alleging a date of first use of the mark anywhere and in commerce on the goods in class 32 as of March 25, 2009. Defendant seeks registration under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), as to the entire mark.

The description of the mark states: "The mark consists of the word 'Brooklyn' appearing above the words 'BrewShop'. 'Brooklyn' is in a smaller type and nests within the space between the first two capitalized letters of 'Brew' ('B') and 'Shop' ('S')." Color is not claimed as a feature of the mark.

In its petition for cancellation and notice of opposition, The Brooklyn Brewery Corporation ("Plaintiff") alleges prior use and registration of the marks BROOKLYN

BREWERY, in standard characters, and    , for goods including:

> Beer mugs; Coffee cups; Cups; Cups and mugs; Dinnerware, namely, cups and glasses; Drinking cups; Drinking glasses; Glass mugs; Goblets; Mugs; Pilsner drinking glasses; plastic cups, in International Class 21;[4]
>
> Brewed malt-based alcoholic beverage in the nature of a beer, in International Class 32.[5]

Plaintiff further alleges prior use and registration of the mark BROOKLYN, in standard characters, for "Beer" in International Class 32.[6] Plaintiff also alleges prior common law rights in the marks BROOKLYN BREWERY for beer and beverage glassware and BROOKLYN for beer (collectively referred to as "Plaintiff's Brooklyn Brewery marks").

---

[4] Registration No. 5094732, issued December 6, 2016 from an application filed on April 7, 2016, with a claim of acquired distinctiveness under Trademark Act Section 2(f). Registration No. 5164268, issued March 21, 2017 from an application filed on April 7, 2016, with a claim of acquired distinctiveness in part as to BROOKLYN under Trademark Act Section 2(f). BREWERY is disclaimed in both registrations.

[5] Registration No. 3186503, issued December 19, 2006 from an application filed on December 21, 2005, with a claim of acquired distinctiveness under Trademark Act Section 2(f); renewed. Registration No. 3186499, issued December 19, 2006 from an application filed on December 21, 2005 with a claim of acquired distinctiveness under Trademark Act Section 2(f); renewed. BREWERY is disclaimed in both registrations.

[6] Registration No. 5216092, issued June 6, 2017 with a claim of acquired distinctiveness under Trademark Act Section 2(f).

Plaintiff alleges:

(1) Defendant's marks are likely to cause confusion with Plaintiff's Brooklyn Brewery marks under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d);[7]

(2) Defendant's BROOKLYN BREW SHOP mark in Reg. No. 4034439 is merely descriptive under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1), and lacked acquired distinctiveness at the time of registration;[8] and

(3) Defendant's **Brooklyn BrewShop** mark in Application Ser. No. 86280776 is primarily geographically descriptive of its goods under Section 2(e)(2) of the Trademark Act, 15 U.S.C. § 1052(e)(2), and lacks acquired distinctiveness.[9]

In its answers, Defendant denies the salient allegations and asserts the affirmative defenses of laches, acquiescence, and equitable estoppel.[10] Defendant timely moved to amend the '776 application to delete all wording in class 32 except for "beer making kit."[11] Defendant's amendment to the identification of goods, opposed by Plaintiff and deferred until final decision, is discussed in more detail below.[12] Defendant also argues that Plaintiff's claim that Defendant's mark is primarily geographically descriptive under Section 2(e)(2) was not properly pleaded.

---

[7] 30 TTABVUE 103–10.

[8] *Id*. at 107–10.

[9] Plaintiff's Br., p. 4, 103 TTABVUE 5.

[10] 40 and 47 TTABVUE.

[11] 14 TTABVUE 2–4.

[12] 16 TTABVUE 3.

## I.  The Record

The parties filed a joint stipulation regarding the admission of evidence.[13] The stipulation provides that documents produced through discovery may be offered into evidence via notice of reliance without witness testimony and will be deemed authentic business records. Moreover, documents submitted in support of or in opposition to Plaintiff's earlier-filed motion for summary judgment shall be deemed admitted into the record. Testimony and related exhibits may be admitted via sworn declaration, and discovery depositions with related exhibits may be introduced via a notice of reliance. The Board, on March 28, 2019, approved the stipulation.[14]

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the files of the involved registration and application. In addition, the parties submitted the following evidence.

### A. Plaintiff:

1. Declaration of Eric Ottaway, Plaintiff's CEO, with exhibits, including status and title copies of Plaintiff's registrations.[15]

---

[13] 59 TTABVUE. The parties have designated much of their testimony as confidential, in some cases, improperly so. In its final decision, the Board must be able to discuss the evidence of record, unless there is an overriding need for confidentiality, so that the parties and a reviewing court will know the basis of the Board's decisions. *Swiss Watch Int'l Inc. v. Fed'n of the Swiss Watch Indus.*, 101 USPQ2d 1731, 1736 n.12 (TTAB 2012). Pursuant to Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g), we exercise our discretion to "treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party."

[14] 85 TTABVUE.

[15] 60–63 TTABVUE.

2. Declaration of Glenn Severance, Plaintiff's Point of Sale Manager, with exhibits.[16]

3. Declaration of Daniel D'Ippolito, Plaintiff's former Communications Coordinator.[17]

4. Declaration of Alyson Deppa, Plaintiff's Assistant Controller.[18]

5. Declaration of Joseph Thompson, Plaintiff's employee.[19]

6. Declaration of Jonathan Reyes, Plaintiff's employee, with exhibits.[20]

7. Declaration of Sarah Blumenthal, Plaintiff's Operations Coordinator.[21]

8. Declaration of Robin Ottaway, Plaintiff's President.[22]

9. Notice of Reliance on third-party registrations printed from the USPTO's TESS database.[23]

10. Notice of Reliance on the summary judgment record, including excerpts from Plaintiff's website, dictionary definitions, Defendant's advertising expenses and sales revenues, and testimony from Defendant.[24]

11. Notice of Reliance on Defendant's confidential financial records.[25]

---

[16] 64–65 TTABVUE.

[17] 66 TTABVUE.

[18] 67 TTABVUE.

[19] 68 TTABVUE.

[20] 69 TTABVUE.

[21] 70 TTABVUE.

[22] 102 TTABVUE.

[23] 71 TTABVUE.

[24] 50–51, 54, and 72 TTABVUE.

[25] 77–78 TTABVUE.

12. Notice of Reliance on internet materials, including excerpts from Defendant's website.[26]

13. Notice of Reliance on Defendant's produced documents, responses to requests for admission, and responses to interrogatories.[27]

14. Notice of Reliance on internet documents and website excerpts relating to home brewing beer.[28]

15. Notice of Reliance on discovery depositions and associated exhibits of Defendant's co-owners, Stephen Valand and Erica Shea.[29]

**B. Defendant:**

1. Declarations of Stephen Valand, with exhibits.[30]

2. Notice of Reliance on deposition of Eric Ottaway, with exhibits.[31]

3. Notice of Reliance on Plaintiff's answers to interrogatories and responses to requests for admission.[32]

4. Notice of Reliance on Plaintiff's produced documents including Plaintiff's trademark Application Serial Nos. 86818336 and 86968215, e-mail chains

---

[26] 74 TTABVUE.

[27] 75–76, and 80 TTABVUE.

[28] 81–82 TTABVUE.

[29] 83–84 TTABVUE.

[30] 86–90 TTABVUE.

[31] 92–93 TTABVUE.

[32] 94 TTABVUE.

produced by Plaintiff, web pages from Plaintiff's website, and alleged admissions from Plaintiff's motion for leave to amend the complaint.[33]

5. Notice of Reliance on internet documents, including dictionary definitions, message board postings, and websites from Brooklyn-based companies.[34]

6. Notice of Reliance on excerpt from deposition of Erica Shea.[35]

## II. Preliminary Matters

### A. Plaintiff's primarily geographically descriptive claim

In addition to its Trademark Act Section 2(d) and 2(e)(1) claims, Plaintiff, in its main brief, also argues that Defendant's stylized BROOKLYN BREW SHOP mark in the '776 application is primarily geographically descriptive under Trademark Act Section 2(e)(2). Defendant objects, pointing out that Plaintiff failed to plead this ground in the amended notice of opposition, and therefore the Board cannot consider it.[36]

A plaintiff may not rely on an unpleaded claim in its brief, and to pursue an unpleaded claim, a plaintiff's pleading must be amended under Fed. R. Civ. P. 15(b) to assert the claim, or the claim must have been tried by express or implied consent. Fed. R. Civ. P. 15(b); *see, e.g.*, *Hornby v. TJX Cos. Inc.*, 87 USPQ2d 1411, 1415 (TTAB 2008). Plaintiff was advised by the Board prior to trial that it had not pleaded a claim

---

[33] 30, and 95–96 TTABVUE.

[34] 97 TTABVUE.

[35] 98–99 TTABVUE.

[36] Defendant's Br., p. 46, 106 TTABVUE 47.

that Defendant's marks are primarily geographically descriptive.[37] Plaintiff was specifically advised by the Board's October 2, 2018 order that "[a]bsent a motion to amend the pleadings, both the cancellation and opposition proceedings will go forward without the primarily geographically descriptive claim."[38] Plaintiff never moved to amend the pleadings to add such a claim.

We also do not find that the claim has been tried by express or implied consent. Because Defendant specifically objected to consideration of this claim, there has been no express consent. Implied consent can only be found where the non-offering party (1) raised no objection to the introduction of evidence on the issue, and (2) was fairly apprised that the evidence was being offered in support of the issue. *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 94 USPQ2d 1645, 1656 (TTAB 2010) ("*Citigroup I*") (quoting TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 501.03(b)), *aff'd*, 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011) ("*Citigroup II*"). "The question of whether an issue was tried by consent is basically one of fairness. The non-moving party must be aware that the issue is being tried, and therefore there should be no doubt on this matter." *Morgan Creek Prods. Inc. v. Foria Int'l Inc.*, 91 USPQ2d 1134, 1139 (TTAB 2009). We do not find Plaintiff's testimony and evidence at trial to have included any clear indication to Defendant that a primarily geographic descriptiveness claim was being tried. Although the geographic significance of Brooklyn was raised, Plaintiff's Section 2(e)(1) claim also relies in part on this

---

[37] Denial of Plaintiff's Motion for Summary Judgment, 55 TTABVUE.

[38] *Id*. at 3 n.5, 55 TTABVUE 3.

geographic significance. Because we cannot say Defendant was on notice that Plaintiff was asserting a geographic descriptiveness claim under Section 2(e)(2), we find that it was not tried with Defendant's implied consent.

In sum, Plaintiff did not specifically assert a Trademark Act Section 2(e)(2) claim in its notice of opposition. Plaintiff, moreover, did not amend its pleadings to add the claim after the Board advised Plaintiff that proceedings would go forward only on the Section 2(d) and 2(e)(1) claims. Having been told by the Board that a Section 2(e)(2) claim would not be considered absent an amendment to the pleadings, Plaintiff will not now be heard to argue that a Section 2(e)(2) claim must be considered. To allow Plaintiff to raise the Section 2(e)(2) claim now would constitute an undue surprise for Defendant, particularly given the Board's order clearly stating that proceedings would go forward without the claim. *Hilson Research Inc. v. Soc'y for Human Resource Mgmt.*, 27 USPQ2d 1423, 1440 (TTAB 1993) (issue of abandonment argued in final brief was neither pleaded nor tried). Accordingly, we have not considered the unpleaded claim that Defendant's mark is primarily geographically descriptive under Section 2(e)(2).

## B. Evidentiary objections

Plaintiff objects to Defendant's exhibits 72 and 73 to the Declaration of Stephen Valand, Defendant's co-owner.[39] The exhibits comprise two spreadsheets, maintained by Defendant, detailing "press mentions" of Brooklyn Brew Shop products, of which

---

[39] 105 TTABVUE.

Defendant became aware since approximately 2012.[40] The spreadsheets list the date, type of press mention, outlet, topic, circulation, media impressions, and the link for the mentions.

Plaintiff objects to the exhibits under Federal Rule 37(c)(1) on the grounds that Defendant failed to produce these documents in discovery, even though the documents allegedly were requested by Plaintiff's document requests. Plaintiff also objects to the exhibits under Federal Rule of Evidence 802 because the spreadsheets contain inadmissible hearsay, including "the estimated number of print editions in circulation" and the "estimated number of readers of a digital publication."[41]

We decline to strike the exhibits inasmuch as Plaintiff does not explain which of its document requests, if any, addressed the spreadsheets of press mentions. With regard to the hearsay objection, we agree that the circulation and media impressions statistics are hearsay, and we have not considered them. With regard to the remainder of the information contained in the spreadsheets, we employ the standard the Board has noted before:

> [T]he Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence, including any inherent limitations. . . . [W]e find no basis on which to strike any testimony or other evidence. As necessary and appropriate, we will point out any limitations in the evidence or otherwise note that the evidence cannot be relied upon in the manner sought. We have considered all of the testimony and evidence introduced into the record. In doing so, we have kept in mind the various objections raised by the parties and we

---

[40] Valand Dec., ¶ 15, p. 6, 86 TTABVUE 8; 90 TTABVUE 1–61.

[41] 105 TTABVUE 2.

> have accorded whatever probative value the subject testimony and evidence merit.

*Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1479 (TTAB 2017). In short, "we simply accord the evidence whatever probative value it deserves, if any at all." *Hunt Control Sys. Inc. v. Koninklijke Philips Elec. N.V.*, 98 USPQ2d 1558, 1564 (TTAB 2011), *rev'd in part on other grounds*, No. 11-3684 (SRC) (CLW), 2017 WL 3719468 (D.N.J. Aug. 29, 2017).

## C. Defendant's motion to amend the identification of goods in the '776 application

Defendant timely moved to amend to the '776 application to delete all goods in class 32 except for "Beer making kit."[42] The motion was filed without the consent of Plaintiff, and Plaintiff filed its opposition to the proposed amendment.[43] The Board deferred consideration of the motion under Trademark Rule 2.133(a), 37 C.F.R. § 2.133(a), until final decision.[44]

Section 18 of the Trademark Act gives the Board the equitable power to, inter alia, "restrict the goods or services identified in an application or registration." 15 U.S.C. § 1068. Pursuant to Section 18 and in conjunction with a motion to amend, a defendant may assert an affirmative defense by moving to restrict its own goods or services in order to avoid any likelihood of confusion alleged by the plaintiff. *Id.*; Trademark Rule 2.133, 37 C.F.R. § 2.133; TBMP § 514 (June 2019). *See also Embarcadero Tech. Inc. v. RStudio Inc.*, 105 USPQ2d 1825, 1841 (TTAB 2013)

---

[42] 14 TTABVUE 2–4.

[43] 15 TTABVUE.

[44] 16 TTABVUE 3.

(proposed amendments restricting the identification of goods to negate the likelihood of confusion).

An acceptable amendment to the identification of goods or services may be permitted, even where an opposer objects, if: 1) the proposed amendment serves to limit the broader identification of goods or services; 2) applicant consents to the entry of judgment with respect to the broader identification of goods or services present at publication; 3) the specimens of record support the goods or services as amended; and 4) if the applicant wishes to avoid the possibility of a *res judicata* effect by the entry of judgment on the original identification, the applicant must make a *prima facie* showing that the proposed amendment serves to change the nature and character of the goods or services or restrict their channels of trade and customers so as to introduce a substantially different issue for trial. *Johnson & Johnson v. Stryker Corp.*, 109 USPQ2d 1077, 1078–79 (TTAB 2013); *Drive Trademark Holdings LLC v. Inofin*, 83 USPQ2d 1433, 1435 (TTAB 2007). Because Defendant consents to entry of judgment as to its broader recitation, the amendment serves to narrow the scope of the identification, and the specimens of record support the goods as amended, we grant Defendant's motion to amend the identification of goods in class 32 to "Beer making kit." Additionally, we find that Defendant has shown that the amendment limits the identification of goods to a beer making kit, thereby changing the nature and character of the goods so as to avoid *res judicata*.

### III. Standing and Priority

Standing is a threshold issue that must be proven by the plaintiff in every inter partes case. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1061–62 (Fed. Cir. 2014); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 187–89 (CCPA 1982); *see also, e.g., Bell's Brewery, Inc. v. Innovation Brewing*, 125 USPQ2d 1340, 1344 (TTAB 2017). In order to meet the standing requirement, a plaintiff need only show that it has a real interest, i.e., a personal stake, in the outcome of the proceeding, and a reasonable basis for its belief of damage. *See Ritchie v. Simpson*, 170 F.3d 1092, 1095, 50 USPQ2d 1023, 1025–26 (Fed. Cir. 1999); *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1727 (Fed. Cir. 2012). A belief in likely damage can be shown by establishing a direct commercial interest. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000). Plaintiff's standing in these consolidated proceedings is established by its pleaded registrations, which the record shows to be valid and subsisting, and owned by Plaintiff. *Cunningham*, 55 USPQ2d at 1844; *Otter Prods. LLC v. BaseOneLabs LLC*, 105 USPQ2d 1252, 1254 (TTAB 2012).

Because Plaintiff's pleaded BROOKLYN BREWERY registrations for "brewed malt-based alcoholic beverage in the nature of a beer" in class 32 are of record, priority is not an issue with respect to "beer."[45] *Christian Broad. Network Inc. v. ABS-CBN Int'l*, 84 USPQ2d 1560, 1565 (TTAB 2007) (where both petitioner and

---

[45] Second amended notice of opposition and petition for cancellation, 30 TTABVUE 103–10; Ottaway Dec., ¶ 5, Exh. A-1, 60 TTABVUE 3 and 12–16.

respondent are owners of registrations, petitioner must prove priority of use; may rely on filing date of application for registration). In addition, Plaintiff has established priority via testimony of its CEO, Eric Ottaway, as to its pleaded BROOKLYN BREWERY marks for beverage glassware in class 21.[46]

Plaintiff has established priority for the mark BROOKLYN for "beer," inasmuch as Plaintiff has established common law use of BROOKLYN for beer since as early as "the late 1980's,"[47] which pre-dates any date upon which Defendant may rely with respect to a "beer making kit."

## IV.    Background[48]

Plaintiff is "among the oldest and largest craft brewers in the United States."[49] For more than thirty years, Plaintiff has sold a variety of beers under its BROOKLYN BREWERY marks.[50] These beers are sold nationwide in thousands of retail establishments, including grocery stores, department stores, pharmacies, convenience stores, and liquor stores.[51] Plaintiff's beer is sold to millions of consumers, and sales of beer have risen considerably to "approximately 277,000

---

[46] Second amended notice of opposition and petition for cancellation, 30 TTABVUE 103–10; Ottaway Dec., ¶¶ 4, 5, and 12, Exhs. A-2 and A-13, 60 TTABVUE 2–3, 5, 17–21, and 89-138.

[47] Plaintiff's Br., p. 44, 103 TTABVUE 45; second amended notice of opposition and petition for cancellation, 30 TTABVUE 103–10; Ottaway Dec., ¶¶ 5, 6, and 14, Exhs. A-3, A-4, and A-7, 60 TTABVUE 3, 5, 22–35, 43–60, and 89-138.

[48] This background narrative is based on evidence and admissions in the record and constitute our findings on the facts discussed, unless otherwise qualified.

[49] Ottaway Dec., ¶¶ 6 and 11, 60 TTABVUE 4.

[50] *Id*. at ¶ 6, 60 TTABVUE 3.

[51] *Id*. at ¶ 9, 60 TTABVUE 3.

barrels" in 2018.[52] Sales revenues, although confidential, have grown significantly in recent years, and are in the tens of millions of dollars annually.[53]

Defendant, Brooklyn Brew Shop, was founded in Brooklyn in 2009 "to create an easy way for people with limited space, such as people living in small apartments, typical of places like Brooklyn, to learn how to brew their own beer."[54] Defendant initially sold its beer-making kits at local Brooklyn flea markets, but eventually it sold the kits in retail establishments such as Bed Bath & Beyond, Whole Foods, Macy's, Urban Outfitters, and Nordstrom, as well as online.[55]

Plaintiff admitted that it "first became aware of [Defendant's] use of 'Brooklyn Brew Shop' as early as 2010."[56] The parties have communicated regularly since at least as early as 2011. For example, in June 2011, several weeks before publication for opposition of Defendant's BROOKLYN BREW SHOP standard character mark for beer-making kits, Plaintiff's Communications Coordinator, Daniel D'Ippolito, corresponded with Defendant via email regarding "calls from people who have intended to contact Brooklyn Brew Shop, but instead have contacted Brooklyn Brewery."[57] In the email, D'Ippolito discussed an article on craftbeer.com that mis-attributed a Brooklyn Brew Shop product to Brooklyn Brewery:[58]

---

[52] *Id*. at ¶ 10, 60 TTABVUE 3.

[53] *Id*. ¶ 10, 65 TTABVUE 32(confidential version),

[54] Valand Dec., ¶ 5, 86 TTABVUE 4.

[55] *Id*. at ¶ 9, 86 TTABVUE 5.

[56] Plaintiff's responses to Defendant's first set of interrogatories, No. 12, 94 TTABVUE 11.

[57] Valand Dec., ¶ 104, 86 TTABVUE 37; Exh. H-3, 80 TTABVUE 39.

[58] *Id*.

```
-----Original Message-----
From: Dan [mailto:dan@brooklynbrewery.com]
Sent: Tuesday, June 28, 2011 5:05 PM
To: beer
Subject: greetings from Brooklyn Brewery

Brooklyn Brew Shop Contact Form
Name: Dan
E-mail: dan@brooklynbrewery.com
Telephone:

Comment: Hello good folks at Brooklyn Brew Shop,

I just wanted to let you know that we are somewhat regularly receiving
emails/calls from people who have intended to contact Brooklyn Brew Shop,
but instead have contacted Brooklyn Brewery. We always make sure to redirect
them appropriately to our homebrewing brethren.

As such, we recently came across this article:
http://www.craftbeer.com/pages/beer-and-food/recipes/recipes-list/show?
title=coconut-maple-porter-ice-cream I
emailed the BA to clear the confusion and to give credit where it's due for
this (insanely delicious looking) recipe.

Obviously it seems folks are simply confusing the somewhat similar business
names, but I just wanted to drop a line to make you aware of the mixup, as
it might be something to keep an eye on.

Cheers,

Dan D'Ippolito
The Brooklyn Brewery
(t) 718.486.7422 | (f) 718.486.7440
dan@brooklynbrewery.com
Twitter @BrooklynBrewery
```

Despite this harbinger of possible confusion as to "business names," the parties began to collaborate on projects related to beer making. Between 2011 and 2016, Plaintiff publicly collaborated with Defendant on a number of projects, including co-branded beer-making kits, books on beer making, and educational programs on beer making. For example, in August of 2011, Plaintiff's merchandising manager, Glenn

Severance, reached out to Defendant to collaborate on the first co-branded beer making kit:[59]

> **Subject:** Brooklyn Brewery
> **Date:** Friday, August 5, 2011 at 12:14:51 PM Eastern Daylight Time
> **From:** Glenn From Brooklyn Brewery
> **To:** Brooklyn Brew Shop
>
> Brooklyn Brew Shop Contact Form
> Name: Glenn From Brooklyn Brewery
> E-mail: gseverance@brooklynbrewery.com
> Telephone: 646-441-7349
>
> Comment: Hi, Stephen and Erica. Glenn Severance here from Brooklyn Brewery. I'm
> the merchandising manager -- anything that bares the Brooklyn Brewery brand, but
> isn't the actual beer.
>
> We've been talking internally for a while now about creating a Brooklyn Brewery
> homebrew kit, complete with some of Steve Hindy's early homebrew recipes and
> brewing tips.
>
> Steve suggested getting in touch with you about sourcing the kit for us. We'd
> take care of the literature and recipes and making/printing of the packaging.
> You guys supply the hardware and assemblage. I'm not sure what you've found
> minimums to be, but we're thinking 200-ish kits.
>
> This could also make for some nice media mention locally and in the beer
> press.
>
> I'll leave a short story long for now. Would love to talk to you about it. Hey,
> how's the Navy Yard working out?
>
> Cheers!
>
> Glenn Severance
> Brooklyn Brewery
> gseverance@brooklynbrewery.com
> 646.441.7349

Eventually, the parties jointly created two co-branded beer-making kits. The kits were manufactured by Defendant, based on Plaintiff's beer recipes, and prominently featured both parties' marks. The first co-branded kit, the "Steve Hindy Edition," was

---

[59] Exh. 157 to Valand Dec., 86 TTABVUE 21, 90 TTABVUE 120.

sold only on Plaintiff's website and in its store between 2012 and 2014.[60] The second co-branded kit, the "Sorachi Ace," was sold between 2015 and 2016[61] by Plaintiff, as well as by Defendant through retailers such as Whole Foods and 1-800-baskets.com.[62] Boxes for the kits, shown below, prominently display Defendant's BROOKLYN BREW SHOP mark and Plaintiff's B BROOKLYN BREWERY mark or stylized B mark.



A number of promotional events were held in conjunction with these co-branded kits. For example, in September 2015, a "launch" event for the second beer making

---

[60] Severance Dec., p. 2, 64 TTABVUE 3.

[61] *Id.*

[62] Valand Dec., 86 TTABVUE 31.

[63] Exh. 173 to Valand Dec., 88 TTABVUE 366.

[64] Exh. 192 to Valand Dec., 89 TTABVUE 45.

kit was held at Plaintiff's brewery, featuring promotional signage touting the parties' collaboration and displaying both of the parties' marks:[65]



The promotional placard states: "BREW SOME BEER Brooklyn Brew Shop and the Brooklyn Brewery have partnered to make it possible (and easy) for brewers worldwide to make their own batches of Brooklyn Sorachi Ace at home." The placard and kit prominently displays both parties' marks.

The parties' employees frequently appeared together at beer-related events, including several at Plaintiff's brewery.[66] At some of these events, Defendant's

---

[65] Exh. 191 to Valand Dec., 89 TTABVUE 43.

[66] Valand Dec., ¶¶ 68–73, 86 TTABVUE 25–26; Exhs. 181–87, 89 TTABVUE 1–39, 90 TTABVUE 157.

employees would provide or pour beer samples made from its kits.[67] For example, the announcement for a 2011 event, titled "HOW TO BREW!" and held at the Brooklyn Brewery, identifies Erica Shea and Stephen Valand from the Brooklyn Brew Shop as lecturers on beer making:[68]



The public collaboration between the parties on a variety of projects continued until approximately May 2015, when Plaintiff alleges it learned about Defendant's

---

[67] *Id.*

[68] Exh. 184 to Valand Dec., 89 TTABVUE 23–24.

registration and application.[69] Plaintiff states that it then conducted an internal inquiry to determine the scope of Defendant's business and impact of Defendant's marks on Plaintiff's rights. Plaintiff argues that it was only after conducting its internal inquiry that it realized the scope of Defendant's business and instances of actual confusion. Plaintiff reached out to Defendant in July of 2015 to voice its objections to Defendant's use of its marks.[70] Plaintiff filed its notice of opposition to the '776 application on September 23, 2015, and its petition for cancellation of the '439 registration on December 10, 2015. The parties conducted settlement negotiations between September 2015 and June 2016 but were unable to settle their dispute amicably.[71]

Defendant filed the application for its standard character mark on February 18, 2011, before the parties' collaborated on the beer-making kits. The mark was published for opposition on July 19, 2011 and the registration issued on October 4, 2011. Thus, when Plaintiff filed the cancellation proceeding on December 10, 2015, approximately four years and five months had passed since publication of Defendant's mark, and four years and two months had passed since registration. For four years during this time—from July 2011, when Defendant's mark was published, until July 2015, when Plaintiff first objected to Defendant's use of the marks—Plaintiff actively collaborated with Defendant on a number of products without objecting to

---

[69] Ottaway Dec., ¶ 24, 60 TTABVUE 8.

[70] *Id*. at ¶ 31, 60 TTABVUE 9.

[71] *Id*. at ¶ 33, 60 TTABVUE 10.

Defendant's use of the BROOKLYN BREW SHOP marks. When confusion was encountered among members of the public, Plaintiff simply advised Defendant in 2011 that such confusion "might be something to keep an eye on."[72] As late as May of 2015, Plaintiff's CEO, Eric Ottaway, told Defendant "While we have no problem with the beer making kit side, we do have a problem with the beer category."[73]

## V. Affirmative Defenses of Laches, Estoppel, and Acquiescence

By statute, the defenses of laches, estoppel, and acquiescence are available in trademark proceedings. *See* 15 U.S.C. § 1069 ("In all inter partes proceedings equitable principles of laches, estoppel, and acquiescence, where applicable may be considered and applied."). Nevertheless, even if proven, equitable defenses cannot serve as a bar to opposition or cancellation based on likelihood of confusion when confusion is inevitable. In that event, any injury to the defendant is outweighed by the public's interest in preventing confusion. *See, e.g.*, *Ultra-White Co. v. Johnson Chem. Indus., Inc.*, 465 F.2d 891, 175 USPQ 166, 167 (CCPA 1972) (equitable defenses not applicable when confusion is inevitable). Nor can equitable defenses bar an opposition or cancellation alleging that a mark is merely descriptive. *See Saint-Gobain Abrasives Inc. v. Unova Indus. Automation Sys. Inc.*, 66 USPQ2d 1355, 1359 (TTAB 2003) (the public interest "cannot be waived by the inaction of any single person or concern no matter how long the delay persists."); *see generally In re Abcor Dev. Corp.*, 588 F.2d 811, 813, 200 USPQ 215, 217 (CCPA 1978) ("The major reasons

---

[72] Exh. H-3 to Plaintiff's notice of reliance, 80 TTABVUE 39.

[73] Exh. 202 to Valand Dec. ¶ 89, 86 TTABVUE 32, 90 TTABVUE 179–80 (confidential).

for not protecting [descriptive] marks are: (1) to prevent the owner of a mark from inhibiting competition in the sale of particular goods; and (2) to maintain freedom of the public to use the language involved, thus avoiding the possibility of harassing infringement suits by the registrant against others who use the mark when advertising or describing their own products.") (citation omitted).

### A. Laches

The equitable principle of laches is available as an affirmative defense that may be raised in answer to a cancellation proceeding based on likelihood of confusion. 15 U.S.C. § 1069; Trademark Rule 2.106(b)(2), 37 C.F.R. § 2.106(b)(2); *see* TBMP § 311.02(b) (June 2019). Generally, laches is not available as a defense in an opposition proceeding because the clock for laches begins to run from the date the application is published for opposition. *Nat'l Cable Television Ass'n v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 19 USPQ2d 1424, 1432 (Fed. Cir. 1991). Laches may be available, however, if the applicant owns a prior registration for substantially the same mark and goods. *See Aquion Partners Ltd. P'ship v. Envirogard Prods. Ltd.*, 43 USPQ2d 1371, 1373 (TTAB 1997) ("[A] laches defense in an opposition proceeding may be based upon an opposer's failure to object to an applicant's earlier registration of substantially the same mark for substantially the same goods.").

Defendant's prior registration of the standard character mark BROOKLYN BREW SHOP for beer-making kits entitles it to use the wording in any font style, including that in the '776 application, for the same goods. *Citigroup II*, 98 USPQ2d at 1259 (registration of standard character mark entitles use of any font style, size or color); *see also In re Aquitaine Wine USA, LLC*, 126 USPQ2d 1181, 1187 (TTAB 2018)

24

(literal elements of standard character marks may be presented in any font style, size or color). Laches thus is available as a defense in the opposition proceeding as to the beer-making kits. *Aquion Partners*, 43 USPQ2d at 1373.[74]

The elements of a laches defense are: (1) unreasonable delay in assertion of one's rights against another; and (2) material prejudice to the latter attributable to the delay. *See Bridgestone/Firestone Research Inc. v. Auto. Club de l'Ouest de la France*, 245 F.3d 1359, 58 USPQ2d 1460, 1463 (Fed. Cir. 2001) ("Mere delay in asserting a trademark-related right does not necessarily result in changed conditions sufficient to support the defense of laches. There must also have been some detriment due to the delay.").

We first consider the element of unreasonable delay in Plaintiff's assertion of its rights against Defendant's registered mark. "In determining whether a party has too long 'slept on its rights' it is necessary to show that the party knew or should have known that it had a right of action, yet did not act to assert or protect its rights." *Bridgestone/Firestone*, 58 USPQ2d at 1462. "[L]aches begins to run no earlier than the date the involved mark was published for opposition (if there was actual

---

[74] Plaintiff argues that the marks in the '439 registration and the '776 application are not the same because Defendant disclaimed BROOKLYN in the registration and claims acquired distinctiveness as to BROOKLYN in the application. Plaintiff's Reply Br., p. 21, 109 TTABVUE 22. This argument is unpersuasive. The '439 registration is constructive notice of a claim of ownership and evidence of an exclusive right to use the mark on the goods. Trademark Act Sections 22 and 33, 15 U.S.C. §§ 1072 and 1115. Moreover, a disclaimer does not remove the disclaimed matter from the mark. The mark must still be regarded as a whole, including the disclaimed matter, in evaluating similarity to other marks. *See In re Nat'l Data Corp.*, 753 F.2d 1056, 1059, 224 USPQ 749, 751 (Fed. Cir. 1985); *Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*, 748 F.2d 669, 672, 223 USPQ 1281, 1282 (Fed. Cir. 1984). Similarly, like a disclaimer, a Section 2(f) claim does not remove matter from the mark.

knowledge[of trademark use]), and no later than the issue date of the registration." *Ava Ruha Corp. v. Mother's Nutritional Center, Inc.*, 113 USPQ2d 1575, 1580 (TTAB 2015) ("If there is actual knowledge of a defendant and its mark prior to publication for opposition, the date of publication is the operative date for laches."); *Christian Broadcasting Network*, 84 USPQ2d at 1572. Given that Plaintiff was aware of Defendant's use of its mark prior to publication of its registered mark for opposition, laches began to run from the date of publication of Defendant's mark in the application underlying the registration, July 19, 2011.[75] *See Krause v. Krause Publ'ns Inc.*, 76 USPQ2d 1904 (TTAB 2005). As noted above, because the marks in Defendant's registration and application are substantially the same, Defendant may rely on the publication date for the registration for its laches defense in the opposition. Plaintiff filed its notice of opposition approximately four years and two months later, on September 23, 2015, and its petition for cancellation approximately four years and five months later, on December 10, 2015.

Delays of as little as three and a half years have constituted laches when coupled with sufficient prejudice to registrants. *See Teledyne Techs., Inc. v. W. Skyways, Inc.*, 78 USPQ2d 1203, 1211 (TTAB 2006) (finding that a delay of three years, eight months supported a laches defense to a cancellation based on Section 2(d) likelihood of confusion), *aff'd*, 208 F. App'x 886 (Fed. Cir. 2006); *Ava Ruha,* 113 USPQ2d at 1581 (finding a laches defense to cancellation supported by a delay of three years and two months); *TPI Holdings, Inc. v. TrailerTrader.com, LLC*, 126 USPQ2d 1409, 1414

---

[75] Plaintiff's response to Defendant's first set of interrogatories, No. 12, 94 TTABVUE 11.

(TTAB 2018) (four years and two months "within the realm of time found to be sufficient for purposes of laches."). We find Plaintiff's delay of more than four years between first publication of Defendant's BROOKLYN BREW SHOP standard character mark and the filing of the petition for cancellation supports a defense of laches.

We further find Plaintiff's delay to be unreasonable. Based on the record, there is no doubt that Plaintiff had full knowledge of the nature of Defendant's activities between 2011 and 2015. As evidenced by the D'Ippolito email, Plaintiff knew before first publication of Defendant's mark that at least some confusion was regularly occurring between the parties' "business names," yet Plaintiff took no action for more than four years. Instead, Plaintiff openly collaborated with Defendant.

Plaintiff argues that its delay was justified because it "believed [Defendant] was a small, local company," and "did not know until May 2015 that [Defendant] claimed rights to the mark for beer and glassware (the goods [Plaintiff] has sold for 30 years) and exclusive rights to BROOKLYN for these and other goods under Section 2(f)."[76]

This argument is unpersuasive. Plaintiff's claim that its delay was justified because it "did not know until May 2015 that Applicant had **registered** BROOKLYN BREW SHOP thus claiming nationwide rights in that mark" is unavailing because Federal registration provides constructive notice of a registrant's mark. Trademark Act Section 22, 15 U.S.C. § 1072 ("Registration of a mark on the principal register . . . shall be constructive notice of the registrant's claim of ownership thereof.").

---

[76] Plaintiff's Rebuttal Br., p. 24, 109 TTABVUE 25.

Moreover, Plaintiff filed the petition for cancellation on December 10, 2015, more than seven months after it allegedly discovered the registration and more than two and one-half months after filing the notice of opposition. That is, Plaintiff continued to delay enforcing its rights against the registration for another seven months after discovering the registration.

Plaintiff additionally argues that Defendant's "progressive encroachment justified any delay."[77] Professor McCarthy explains that progressive encroachment may justify delay in enforcing one's rights under certain circumstances:

> Under the doctrine of "progressive encroachment," a trademark owner is not forced by the rule of laches to sue until the likelihood of confusion caused by the accused use presents a significant danger to the mark. A relatively low level infringement or use of a similar mark in a different product or service line or in a different territory does not necessarily trigger an obligation to immediately file suit. But when the accused use moves closer or increases in quantity, the doctrine of progressive encroachment requires the trademark owner to remain alert and to promptly challenge the new and significant acts of infringement. Thus, there may be no obligation to sue until the accused use progressively encroaches on the trademark.

*Jansen Enters. Inc. v. Rind*, 85 USPQ2d 1104, 1116 (TTAB 2007) (quoting MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:20 (4th ed. updated 2006)). Laches is an equitable defense and we must balance the equities of the parties. As stated in *Ralston Purina Co. v. Midwest Cordage Co.*, 373 F.2d 1015, 153 USPQ 73, 77 (CCPA 1967), "Registrant's [laches or acquiescence] defense is, after all, an equitable one.

---

[77] Plaintiff's Rebuttal Br., p. 24, 109 TTABVUE 25.

We do not scan petitioner's history for one fatal misstep. We sustain petitioner's rights in the absence of a showing that to do so would work injustice."

We find that the goods in the '776 application expand beyond Defendant's original beer-making kits. Defendant seeks registration of the stylized BROOKLYN BREW SHOP mark for, inter alia, sanitizing preparations, glassware, coasters, and most importantly, beer. We find, however, that the doctrine of progressive encroachment does not justify Plaintiff's delay in bringing the cancellation proceeding.

Certainly, Defendant's '776 application expanded the nature of its goods by including additional goods, and sought registration under Section 2(f) as to BROOKLYN, which was disclaimed in the prior registration. However, a defense of progressive encroachment cannot excuse a delay in bringing a cancellation against a prior registration where, as here, the Defendant's goods remain within the scope of the registration. "For purposes of an attack on a registration, there can be no 'progressive encroachment' where the alleged encroachment is within the scope of the registration at issue." *Ava Ruha,* 113 USPQ2d at 1583 (no progressive encroachment by registrant who sold fresh produce from its specialty retail grocery stores specializing in sales to pregnant women and new mothers where such sales were within the scope of the registration for such specialty stores); *see also ProFitness Physical Therapy Center v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.,* 314 F.3d 62, 65 USPQ2d 1195, 1199 (2d Cir. 2002) (actionable infringement for Defendant's use of a mark in a different manner limited to the extra-consensual use).

Here, the beer-making kits identified in Defendant's registration and application are the same as those Defendant has long sold and do not represent "new and significant acts" of encroachment so as to excuse Plaintiff's delay in bringing the cancellation and opposition proceedings as to these goods. *Jansen*, 85 USPQ2d at 1116; *see also* MCCARTHY, § 31:20 (5th ed. March 2020).

Moreover, Plaintiff was long aware of the nationwide sales of Defendant's beer-making kits. Defendant's use therefore cannot be considered a "low level" of encroachment. *Jansen*, 85 USPQ2d at 1116. Rather, Plaintiff encouraged Defendant to sell co-branded kits "at the big retail chains (Whole Foods, Wegmen's, and Costco)."[78] Plaintiff knew that Defendant's use of the BROOKLYN BREW SHOP marks had caused instances of confusion as to the parties' business names and therefore might be "a significant danger to the mark." *Id*. Nevertheless, as Plaintiff's CEO admitted, "Brooklyn Brewery never expressed any dissatisfaction or displeasure to Brooklyn Brew Shop regarding Brooklyn Brew Shop's use of the 'Brooklyn Brew Shop' name before May of 2015."[79] In light of Plaintiff's knowledge of instances of confusion, Plaintiff's "wait and see approach" was unreasonable.[80]

Defendant also suffered material prejudice because of Plaintiff's delay. One type of detriment is economic prejudice arising from investment in and development of a trademark, as well as the continued commercial use and economic promotion of a

---

[78] Exh. 188 to Valand Dec., 90 TTABVUE 159.

[79] Ottaway dep., p. 127, 92 TTABVUE 130.

[80] Plaintiff's Rebuttal Br., p. 24, 109 TTABVUE 25.

mark over a prolonged period. *Bridgestone/Firestone*, 58 USPQ2d at 1463. Here, Defendant continued to grow its business between 2011 and 2015. Defendant increased its spending on advertising,[81] had two books published promoting its beer recipes,[82] saw its marks promoted by a number of third-party sources,[83] and increased sales by three-hundred percent.[84] Loss of Defendant's rights in BROOKLYN BREW SHOP for beer-making kits would result in severe economic prejudice and would be a detriment to Defendant due to the delay.

Based on the evidence of record, we find Defendant has proven laches as to the beer-making kits. Plaintiff unreasonably delayed in asserting its rights, and Defendant would suffer detriment should its registration be cancelled or its application for beer-making kits be denied.

## B. Acquiescence and estoppel

We next consider Defendant's affirmative defense of acquiescence, which subsumes its arguments regarding equitable estoppel. Acquiescence is different from laches and is appropriate in cases "where the trademark owner, by *affirmative* word or deed, conveys its implied consent to another. That is, laches denotes a merely passive consent, while acquiescence implies active consent." MCCARTHY, § 31:41. As stated by the Board:

> Acquiescence is a type of estoppel that is based upon the plaintiff's conduct that expressly or by clear implication

---

[81] Exh. 127 to Valand Dec., 86 TTABVUE 12, 90 TTABVUE 68–80.

[82] Exhs. 74 and 75 to Valand Dec., 86 TTABVUE 9, 87 TTABVUE 42–51.

[83] *See, e.g.*, exhs. 11–60, 86 TTABVUE 77–289.

[84] Exh. 152 to Valand Dec., 86 TTABVUE 38, 90 TTABVUE 85–108.

> consents to, encourages, or furthers the activities of the defendant, that is not objected to. . . . A plaintiff will not be permitted to stop conduct that it fostered or tolerated, where the result would be prejudicial to the defendant.

*Christian Broadcasting Network*, 84 USPQ2d at 1573 (TTAB 2007) (internal citations omitted).

To establish the defense of acquiescence, Defendant must prove that Plaintiff's conduct amounted to "an assurance by the plaintiff to the defendant, either express or implied that plaintiff will not assert his trademark rights against the defendant." *CBS, Inc. v. Man's Day Publ'g Co.*, 205 USPQ 470, 473-74 (TTAB 1980). Acquiescence requires proof of three elements, namely that: (1) plaintiff actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused defendant undue prejudice. *See Coach House Rest. Inc. v. Coach and Six Rests., Inc.*, 934 F.2d 1551, 19 USPQ2d 1401, 1409 (11th Cir. 1991) (acquiescence requires active consent).

As with laches, in the context of a defense of acquiescence, consideration of any period of delay is tied to a party's application for registration of a mark rather than to its use of the mark. *Id.*, 19 USPQ2d at 1405 ("[T]he earliest point at which the delay period began running was the time of registration.")*; see also Nat'l Cable Television*, 19 USPQ2d at 1432 (period of delay for equitable defense "begins to run from the time action could be taken against the acquisition by another of a set of rights to which objection is later made."). Because Defendant's registration and

application cover a variety of goods, we address acquiescence as to these goods separately.

> ### i. Defendant's beer-making kits in the '439 registration and the '776 application

As discussed above, Defendant's application underlying the '439 registration published for opposition on July 19, 2011, and the mark registered on October 4, 2011. Between 2011 and 2016, Plaintiff publically collaborated with Defendant on a number of projects, including the co-branded beer-making kits, books on beer making, and educational programs on beer making. Defendant's BROOKLYN BREW SHOP mark featured prominently in all of these activities. Accordingly, we find that during the relevant period of delay—from July 19, 2011, until May of 2015, when Plaintiff first voiced its concerns about Defendant's marks—Plaintiff actively represented that it would not assert a right or a claim against Defendant's use of its BROOKLYN BEER SHOP mark in connection with beer-making kits.

We likewise find that Plaintiff's nearly four-year delay between the active representation that it did not object to Defendant's registered mark in connection with beer-making kits and assertion of the right or claim underlying these proceedings was not excusable. Plaintiff argues that its delay in bringing these proceedings is justified because it believed Defendant to be a "small, local company."[85] This argument is belied, however, by the fact that Plaintiff knew that Defendant was selling its kits through major national retailers such as Whole Foods and 1-800-

---

[85] Plaintiff's Rebuttal Br., p. 24, 109 TTABVUE 25.

baskets.com. Indeed, Plaintiff sought to sell the co-branded kits "at the big retail chains (Whole Foods, Wegmen's, Costco) who frequently inquire of us if we have plans to do a homebrew collaboration with the Brew Shop so they can stock their shelves with it."[86] Further, as discussed above, Plaintiff's claim that its delay was justified because it "did not know until May 2015 that Applicant had **registered** BROOKLYN BREW SHOP thus claiming nationwide rights in that mark" is unavailing because federal registration provides constructive notice of a registrant's mark. Trademark Act Section 22, 15 U.S.C. § 1072.

Finally, as discussed above, during the nearly four-year period of active collaboration between the parties, Defendant continued to invest in and grow its beer making kit business under the BROOKLYN BREW SHOP marks. We thus find that Plaintiff's delay in asserting its rights caused defendant undue prejudice.

Based on the foregoing, we find Plaintiff's actions "constitute a classic example of acquiescence" regarding Defendant's use of the BROOKLYN BREW SHOP marks on beer-making kits. *Man's Day Publishing*, 205 USPQ at 475.

### ii.    Defendant's other goods in the '776 application

We find that Plaintiff has not acquiesced to Defendant's use of its mark on the other goods recited in the '776 application, namely, sanitizing preparations, glassware, and coasters. Plaintiff's collaborative activities were limited to the beer-making kits, not these other goods. Plaintiff cannot be said to have actively represented that it would not assert a right or a claim against the other goods; there

---

[86] Exh. 188 to Valand Dec., 90 TTABVUE 159.

was no delay in Plaintiff's assertion of its rights in its mark for the goods; and Defendant has suffered no undue prejudice. Instead, the other goods in the '776 application exceed the scope of the Plaintiff's acquiescence. *See ProFitness Physical Therapy*, 65 USPQ2d 1199 (actionable infringement for Defendant's use of a mark in a different manner limited to the extra-consensual use); *Operation Able of Greater Boston, Inc. v. Nat'l Able Network, Inc.*, 646 F. Supp. 2d 166, 92 USPQ2d 1932, 1938 (D. Mass. 2009) (defendant's "expansion into areas that more directly overlap with the plaintiff's services has, however, created confusion and plaintiff is not precluded from asserting its rights now notwithstanding its prior acquiescence to some uses of the marks. Accordingly, this Court concludes that the defenses of acquiescence or laches do not foreclose a challenge to defendant's **expanded** use of the marks.").

### C. Summary of findings on laches and acquiescence

We find that Defendant has established the defenses of laches and acquiescence as to its beer-making kits in the '439 registration and the '776 application, thereby increasing Plaintiff's burden of proof as to these goods to a showing of inevitable confusion. *Ultra-White*, 175 USPQ at 167. Because Defendant has not established either defense as to the remaining goods in the '776 application, Plaintiff's burden as to these goods remains the same, a showing of a likelihood of confusion by the preponderance of the evidence. *Cunningham*, 55 USPQ2d at 1848.

## VI. Likelihood of Confusion and Inevitable Confusion

We turn now to Plaintiff's claim alleging likelihood of confusion and inevitable confusion. Our determination under Trademark Act Section 2(d) is based on an

analysis of all the facts in evidence that are relevant to the factors bearing on likelihood of confusion. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). We keep in mind that the equitable defenses established in this case cannot serve as bars against the petition for cancellation if confusion is inevitable. *Ultra-White*, 175 USPQ at 167.

Accordingly, we determine whether confusion is inevitable as to the beer-making kits, but only likely as to the other goods in the '776 application. In determining the issue of confusion, whether inevitable or likely, we consider all of the *DuPont* factors that are relevant in this case and for which there is evidence of record. *In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019) (Board considers each *DuPont* relevant factor for which there is evidence and argument); *Turner v. Hops Grill & Bar, Inc.*, 52 USPQ2d 1310, 1313 (TTAB 1999) ("[T]o determine whether confusion is inevitable, we must use the multifactor analysis required by [*DuPont*]"). Varying weights may be assigned to each *DuPont* factor depending on the evidence presented. *Citigroup II*, 98 USPQ2d at 1261; *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687-88 (Fed. Cir. 1993). The relevant *DuPont* factors in this proceeding are discussed below.

Defendant's marks are BROOKLYN BREW SHOP, in standard characters, for beer-making kits, and for household sanitizing preparations, beverage glassware, non-paper coasters, and beer-making kits. Plaintiff's marks are

BROOKLYN BREWERY, in standard characters, and , for beer, glassware and cups, as well as BROOKLYN for beer.

In our analysis, we focus on Plaintiff's BROOKLYN BREWERY mark in standard characters and its BROOKLYN mark, also in standard characters. We consider these marks to be the most pertinent of Plaintiff's pleaded registrations for our *DuPont* analysis because they are in standard characters, and therefore must be considered "regardless of font style, size, or color." *Citigroup II*, 98 USPQ2d at 1259. *See, e.g., Fiserv, Inc. v. Elec. Transaction Sys. Corp.*, 113 USPQ2d 1913, 1917 (TTAB 2015); *In re Max Capital Grp. Ltd.*, 93 USPQ2d 1243, 1245 (TTAB 2010).

**A. Similarity of the goods, channels of trade and classes of consumers**

We begin with consideration of the parties' respective goods, channels of trade and classes of consumers, noting that they do not have to be identical or directly competitive to support a finding that there is a likelihood of confusion. *On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471, 1475 (Fed. Cir. 2000). It is sufficient if the respective goods are related in some manner or that the conditions surrounding their marketing are such that they would be encountered by the same persons under circumstances that could, because of the similarity of the marks used in connection therewith, give rise to the mistaken belief that they emanate from or are associated with a single source. *Coach Servs., Inc. v. Triumph Learning LLC*, 101 USPQ2d at 1722; *In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783, 1785 (TTAB 1993).

### i.　Class 21

The parties' goods are, in part, identical because both identify beverage glassware in class 21. It is sufficient for finding likelihood of confusion that relatedness is established for any item encompassed by the identification of goods in a particular class in the application. *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp., Inc.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981). Moreover, given that these goods are identical, they are "presumed to travel in the same channels of trade to the same class of purchasers." *In re Viterra Inc.*, 671 F.3d 1358, 1362, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (quoting *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1268, 62 USPQ2d 1001, 1005 (Fed. Cir. 2002)).

### ii.　Class 32

Regarding Defendant's beer-making kits, in class 32, Plaintiff argues, "Beer and beer-making kits are the types of goods that consumers expect to be sold by the same company under the same mark."[87] In support, Plaintiff has introduced more than fifty copies of use-based third-party registrations for marks for beer as well as beer-making kits. The following examples are representative:[88]

- Reg. No. 5110894 for the mark BACK ALLEY PORTER;
- Reg. No. 5642753 for the mark BENEVOLENT OVERLORD;
- Reg. No. 4605122 for the mark BLACK GULL;
- Reg. No. 4682513 for the mark CAMINO BREWING COMPANY;
- Reg. No. 5342530 for the mark CITIZEN KELLY;

---

[87] Plaintiff's Br., p. 42, 103 TTABVUE 43.

[88] Plaintiff's notice of Reliance, Exhs. D-1 to D-63, 71 TTABVUE 1–198.

- Reg. No. 5309422 for the mark DANCING MONK;

- Reg. No. 4665462 for the mark MALTY DOG BREWERY; and

- Reg. No. 4570226 for the mark SANTA BARBARA PALE ALE.

Although these third-party registrations are not evidence that the registered marks are currently in use or that the public is familiar with them, they nonetheless have some probative value to the extent they are based on use in commerce and serve to suggest that beer and beer-making kits are of a kind that may emanate from a single source under a single mark. *See In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1203 (TTAB 2009); *In re Albert Trostel*, 29 USPQ2d at 1785-86. Indeed, Defendant's '776 application sought to register the stylized BROOKLYN BREW SHOP mark for both beer and beer-making kits, and, as noted above, the parties collaborated on co-branded beer-making kits. And Defendant owns four registrations for other marks covering both beer and beer-making kits.[89]

On the other hand, the record does not indicate whether any of these third-party marks are in use or how common it is for one business to offer both beer and beer-making kits. We agree with Defendant that beer and beer-making kits are not interchangeable goods because "making beer from a kit takes weeks"[90] and the kits cannot be sold for immediate consumption of beer. But, as noted above, the goods do not have to be identical or directly competitive to support a finding that there is a likelihood of confusion. *On-line Careline*, 56 USPQ2d at 1475. These considerations

---

[89] *Id.*, Exhs. D-64-65, D-68, and D-70, 71 TTABVUE 199–204, 209–11, and 214–16.

[90] Defendant's Br., p. 34, 106 TTABVUE 35.

are outweighed by Plaintiff's evidence, and we find that beer-making kits are related to beer.

Regarding the channels of trade for beer and beer-making kits, the record shows that the respective goods are sold in some of the same stores, such as Whole Foods as well as Total Wine and More.[91] As discussed above, Defendant's beer-making kits were sold by Plaintiff in its brewery alongside its beer. Defendant nevertheless argues that the majority of its beer-making kits are sold in different channels of trade such as "department stores, kitchenware stores, gift shops, internet-based retailers, and other food purveyors."[92] Defendant points out that when its "beer-making kits are sold at food retailers, they are often sold in the cheese or whole-body section rather than the beer and alcohol section."[93] These arguments are unpersuasive. The fact that Defendant's beer-making kits and Plaintiff's beer may sometimes be sold in different channels of trade does not outweigh the fact that at other times they are sold in the same channels of trade. Accordingly, we find that beer and beer-making kits are offered in similar trade channels.

Regarding the classes of consumers for beer and beer-making kits, the record shows that the respective goods are sold to beer drinkers as well as to consumers looking to buy gifts for beer drinkers.[94] The population of beer drinkers willing to

---

[91] Exh. E-6 to Plaintiff's notice of reliance, 7735. TTABVUE 113; Ottaway Dec., ¶ 9, 60 TTABVUE 3.

[92] Defendant's Br., p. 34, 106 TTABVUE 35.

[93] *Id.*

[94] *See, e.g.*, exhs. 11–60, 86 TTABVUE 77–289.

brew their own beer likely is small as compared to the overall population of beer drinkers, but they are nevertheless part of the same larger beer-drinking group. Accordingly, we find the classes of consumers for Defendant's beer-making kits and Plaintiff's beer to be overlapping.

### iii.    Class 5

Regarding Defendant's sanitizing preparations for household use in class 5, we note that they are sold as part of the beer-making kits, and also to replenish kits after they have been used.[95] Plaintiff argues the sanitizing preparations are related to its goods: "The only reason a customer would purchase one of Applicant's sanitizing preparations is so that he or she can use it to make beer in Applicant's kit. [They] are thus related to Opposer's beer and beverage glassware for all the same reasons as Applicant's beer kits."[96]

Defendant, for its part, argues that Plaintiff "provides only argument, and no evidence, that sanitizing preparations . . . are related to the goods in its registrations."[97] We agree the record does not establish that sanitizing preparations for household use are related to beer for likelihood of confusion purposes. The mere fact that sanitizing preparations are sold as a component of Defendant's beer-making kits does not establish that consumers would expect brewers such as Plaintiff to supply sanitizing preparations.

---

[95] Erica Shea Dep., p. 77, 84 TTABVUE 293.

[96] Plaintiff's Br., pp. 44–45, 103 TTABVUE 45–46.

[97] Defendant's Br., p. 32, 106 TTABVUE 33.

We note, for example, that none of Plaintiff's more than fifty third-party registrations, encompassing both beer and beer-making kits, include sanitizing preparations. Nor do any of Defendant's other four registrations for beer-making kits include sanitizing preparations. This suggests sanitizing preparations are only peripherally related to beer-making kits, much less beer. We also find the record does not establish that Defendant's sanitizing preparations for household use—particularly when sold individually—are likely to travel in the same channels of trade to the same classes of consumers as Plaintiff's beer. Thus, consumers familiar with Plaintiff's goods are not likely to think that Defendant's sanitizing preparations emanate from or are associated with the same single source. *Albert Trostel,* 29 USPQ2d at 1785.

In sum, we find the parties' goods are identical in part as to beverage glassware in class 21, and related as to Plaintiff's beer and Defendant's beer-making kits in class 32. Additionally, we find these goods are offered in some of the same channels of trade, and are sold to the same classes of consumers. These *DuPont* factors favor a finding of a likelihood of confusion as to these goods. However, we find the record does not establish that Defendant's sanitizing preparations for household use in class 5 are related to Plaintiff's beer or glassware, or that they are offered in the same channels of trade, or are sold to the same classes of consumers. These *DuPont* factors, therefore, weigh against a finding of a likelihood as to these goods.

## B. Strength of Plaintiff's marks

We consider the strength of Plaintiff's marks in order to evaluate the scope of protection to which they are entitled. In determining strength of a mark, we consider

both inherent or conceptual strength, based on the nature of the mark itself, and fame or commercial strength. *Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458, 1476 (TTAB 2014); *see also In re Chippendales USA Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength . . . and its marketplace strength[.]"); MCCARTHY, § 11:80 ("The first enquiry focuses on the inherent potential of the term at the time of its first use. The second evaluates the actual customer recognition value of the mark at the time registration is sought or at the time the mark is asserted in litigation to prevent another's use."). The commercial strength of a mark rests on the extent to which "a significant portion of the relevant consuming public . . . recognizes the mark as a source indicator." *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017) (citing *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005)). A very strong mark receives a wider latitude of legal protection in the likelihood of confusion analysis. *See Palm Bay*, 73 USPQ2d at 1694 (strong marks "enjoy wide latitude of legal protection" and are "more attractive as targets for would-be copyists").

Plaintiff does not address the conceptual strength of its marks. We find they are inherently weak. The marks registered pursuant to a claim of acquired distinctiveness under Section 2(f), 15 U.S.C. § 1052(f), an admission that the marks are not inherently distinctive. *See Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 92 USPQ2d 1626, 1629 (Fed. Cir. 2009) ("Where an applicant

seeks registration on the basis of Section 2(f), the mark's descriptiveness is a nonissue; an applicant's reliance on Section 2(f) during prosecution presumes that the mark is descriptive."); *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988) ("Where, as here, an applicant seeks a registration based on acquired distinctiveness under Section 2(f), the *statute* accepts a lack of inherent distinctiveness as an established fact.").

As Plaintiff's dictionary definition of Brooklyn[98] and Defendant's internet excerpts from Brooklyn-named establishments suggest, "Brooklyn" is a well-known geographic place. It is one of the five boroughs of New York City and its population in 2017 was reported to be 2,648,771.[99] And it is undisputed that Plaintiff is located in Brooklyn. The presence of the generic term "brewery" does little to bolster the inherent strength of Plaintiff's primarily geographically descriptive BROOKLYN BREWERY mark. *See In re JT Tobacconists*, 59 USPQ2d 1080 (TTAB 2001) (MINNESOTA CIGAR COMPANY primarily geographically descriptive of cigars). Accordingly, we find that Plaintiff's BROOKLYN BREWERY and BROOKLYN marks are inherently weak.

Regarding commercial strength of its marks, Defendant argues that Plaintiff's marks are entitled to a narrow scope of protection because "[t]he word 'Brooklyn' is so ubiquitous in commerce that it has limited significance in the overall commercial

---

[98] Dictionary.com, 50 TTABVUE 85–86.

[99] Https://en.wikipedia.org/wiki/Brooklyn, accessed May 8, 2018, 50 TTABVUE 58–84.

impression of the marks."[100] In support, Defendant introduced internet web pages from six local Brooklyn-formative named establishments selling beer:[101]

- Brooklyn Beer & Soda, a craft beer and soda store;

- Brooklyn Brewhouse, a restaurant and bar serving draft and bottled beer;

- BRKLYN Beer Garden, a bar featuring draft beers;

- Brooklyn Bavarian Biergarten, a restaurant serving food and beer;

- Brooklyn Burgers & Beer, a restaurant serving food and craft beer; and

- Brooklyn Tap House, a restaurant serving food and craft beer.

To establish further the ubiquity of "Brooklyn" in business names, albeit by other beverage businesses, Defendant introduced internet web page excerpts from eight local Brooklyn-formative named establishments selling coffee or coffee beverages.[102]

- Brooklyn Bean Roastery;

- Brooklyn Coffeehouse;

- Brooklyn Diamond Coffee;

- Brooklyn Java;

- Brooklyn Roasting Company;

- Brooklyn Bagel & Coffee Company;

- Cup of Brooklyn; and

- Olde Brooklyn Coffee.

---

[100] Defendant's Br., p. 30, 106 TTABVUE 31.

[101] Exhs. 205–10 to Valand Dec. ¶ 93, 86 TTABVUE 33, 89 TTABVUE 68–97.

[102] Defendant's notice of reliance, Exhs. 239–46, 97 TTABVUE 47–74.

Evidence of third-party use of similar marks for the same or similar goods is relevant to a mark's commercial strength or weakness. *In re i.am.symbolic, LLC*, 866 F.3d 1315, 123 USPQ2d 1744, 1751 (Fed. Cir. 2017). The six local Brooklyn-formative named establishments' use of the term "Brooklyn" in connection with beer sales have significant probative value. But beyond showing that "Brooklyn" is commonly used by businesses based in Brooklyn, the web pages from coffee retailers are not particularly probative because the record does not show that the businesses brew or sell beer or sell accessories such as glassware and coasters. Nevertheless, it is not unexpected for Brooklyn-based businesses to use the term "Brooklyn" as part of their business names in order to identify their location.

Plaintiff argues its "BROOKLYN BREWERY mark is commercially strong due to Plaintiff's long use of the mark and acclaim from both the craft beer industry and from consumers."[103] Plaintiff has used the BROOKLYN BREWERY mark in connection with beer for more than thirty years;[104] it has annual revenues in the tens of millions of dollars;[105] and its beers have won a number of awards[106] and received extensive unsolicited media coverage.[107] We agree that Plaintiff's BROOKLYN BREWERY mark has achieved a degree of commercial strength through long use,

---

[103] Plaintiff's Br., p. 49, 103 TTABVUE 50.

[104] Ottaway Dec., ¶ 4, 60 TTABVUE 4.

[105] Ottaway Dec., ¶ 10, 65 TTABVUE 32.

[106] Ottaway Dec., ¶ 20, 60 TTABVUE 7; Exhs. A-35–A-36, 63 TTABVUE 71–87.

[107] Ottaway Dec., ¶ 17, 60 TTABVUE 6; Exhs. A-13–A-34, 60 TTABVUE 89–280, 61–63 TTABVUE.

advertising, sales, and public recognition, at least as to the goods covered by Plaintiff's registrations.

On the other hand, little of Plaintiff's evidence regarding the strength of its marks is directed to the use of BROOKLYN by itself. Instead, most of the news stories refer primarily to BROOKLYN BREWERY while occasionally using the term "BROOKLYN" as a shorthand term thereafter. If a mark, or an element of a mark, is used extensively in commerce by a number of third parties, the commercial strength of the mark can be undermined, as the consuming public may have become familiar with a multiplicity of the same or similar marks, and can distinguish them based on minor differences. *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015) (citation omitted); *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. v. Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015). "The weaker [a registrant's] mark, the closer an applicant's mark can come without causing a likelihood of confusion and thereby invading what amounts to its comparatively narrower range of protection." *Juice Generation*, 115 USPQ2d 1674. Given the geographic significance of "Brooklyn" and the evidence of third-party use of the term in connection with the sale of beer and other beverages, we do not find that Plaintiff has established that its BROOKLYN mark is commercially strong for beer.

In sum, we find that Plaintiff's BROOKLYN BREWERY and BROOKLYN marks are conceptually weak. However, when used in connection with the subject goods, BROOKLYN BREWERY and BROOKLYN have nevertheless achieved a degree of

commercial recognition. These findings offset one another. We therefore find Plaintiff's marks to be entitled neither to an enhanced nor a diminished scope of protection. *Palm Bay*, 73 USPQ2d at 1694.

### C. Similarity of the marks

Turning to the first *DuPont* factor, we compare the marks "in their entireties as to appearance, sound, connotation and commercial impression." *Palm Bay*, 73 USPQ2d at 1691 (quoting *DuPont*, 177 USPQ at 567). "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs., Inc. v. Triumph Learning LLC*, 101 USPQ2d at 1721 (citation omitted). The appropriate emphasis is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks or service marks. *Spoons Rests., Inc. v. Morrison, Inc.*, 23 USPQ2d 1735, 1741 (TTAB 1991) (citations omitted), *aff'd mem.*, 972 F.2d 1353 (table) (Fed. Cir. 1992). *See Franklin Mint Corp. v. Master Mfg. Co.*, 667 F.2d 1005, 212 USPQ 233, 234 (CCPA 1981). Here, the average purchasers include ordinary consumers seeking beer and beer accessories, namely glassware and coasters.

Plaintiff's marks are BROOKLYN BREWERY and BROOKLYN, both in standard character form. Defendant's marks are BROOKLYN BREW SHOP in standard characters, and in stylized form. We find the marks are more similar than not in appearance, sound, connotation and commercial impression.

Regarding appearance, all of the marks begin with—or consist entirely of— the geographic term BROOKLYN. Because Plaintiff's marks are in standard characters, they "could be used in any typeface, color, or size, including the same stylization actually used . . . by the other party, or one that minimizes the differences or emphasizes the similarities between the marks." *Anheuser–Busch, LLC v. Innvopak Sys. Pty Ltd.*, 115 USPQ2d 1816, 1823 (TTAB 2015) (citing *Citigroup II*, 98 USPQ2d at 1258-59). Regarding sound, Plaintiff's BROOKLYN BREWERY mark and Defendant's BROOKLYN BREW SHOP marks both comprise the term BROOKLYN followed by a BREW-formative term, giving these marks similar alliteration and overall sound.

Regarding connotation and commercial impression, all of the marks suggest an association with Brooklyn, a well-known geographic place. Moreover, BROOKLYN BREWERY and BROOKLYN BREW SHOP have an additional connotative similarity because they both connote beer.[108]

Further, we consider BROOKLYN to be the most dominant portion of the parties' marks because BREWERY and BREW SHOP are at least descriptive, if not generic. *See Viterra*, 101 USPQ2d at 1908 (the court may place more weight on a dominant portion of a mark, for example if another feature of the mark is descriptive or generic standing alone, however, the ultimate conclusion nonetheless must rest on consideration of the marks in total); *In re Dixie Rests., Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997) ("DELTA," not the disclaimed generic term "CAFE," is

---

[108] 50 TTABVUE 87–89.

the dominant portion of the mark THE DELTA CAFE); *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) ("[T]here is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties.").

For the foregoing reasons, we find that Plaintiff's BROOKLYN and BROOKLYN BREWERY marks and Defendant's BROOKLYN BREW SHOP marks to be more similar than dissimilar in overall appearance, sound, connotation, and commercial impression.

### D. Actual confusion

The seventh and eighth *DuPont* factors consider the nature and extent of any actual confusion among consumers in light of the length of time and conditions under which there has been contemporaneous use of the parties' subject marks. *DuPont*, 177 USPQ at 567. Evidence of actual confusion, where it exists, would of course be highly probative of a likelihood of confusion. *See Edom Labs, Inc. v. Lichter*, 102 USPQ2d 1546, 1553 (TTAB 2012) ("The existence of actual confusion is normally very persuasive evidence of likelihood of confusion and undercuts any possible claim that the marks are so dissimilar that there can be no likelihood of confusion."). Properly introducing instances of actual confusion into the record and persuading the trier of fact as to the probative value of such evidence is Plaintiff's burden. *See Georgia-Pacific Corp. v. Great Plains Bag Co.*, 614 F.2d 757, 204 USPQ 697, 701 (CCPA 1980) ("Actual confusion is entitled to great weight but only if properly proven.").

Plaintiff argues "[t]he overwhelming amount of actual confusion evidence here is dispositive of a 'high' likelihood of confusion and indeed, of inevitable confusion."[109] Plaintiff introduced evidence from a variety of sources purportedly establishing extensive actual confusion. As Plaintiff argues, "the record evidence here shows many dozens of instances of actual confusion, including testimonial evidence from the parties, current and former employees, and documents produced by Applicant from its own files."[110] We agree Plaintiff submitted a great deal of evidence purporting to show many instances of actual confusion. But, as explained below, we do not think it entitled to nearly the weight Plaintiff urges.

### i. Admissions and emails from Defendant

In its response to Plaintiff's interrogatories, Defendant admitted to the following instances of third-party confusion:[111]

- March 14, 2011: Visual merchandiser Natalie Burke at a West Elm Market location created signage alongside Defendant's goods that read Brooklyn Brewery. After informing Defendant, signage was corrected.
- June 28, 2011: Craftbeer.com credited a beer ice cream recipe to Brooklyn Brewery that was written by Brooklyn Brew Shop. Author Meghan Storey was informed of mistake and credit was corrected.
- January 16, 2014: Sam Hanlin applied for a job through Defendant's contact form on brooklynbrewshop.com and referred to Defendant as "Brooklyn Brewery"
- May 6, 2014: Perri Gross notified Defendant through contact form on brooklynbrewshop.com that he accidentally referred to Defendant as Brooklyn Brewery in a job application

---

[109] Plaintiff's Br., p. 46, 103 TTABVUE 47.

[110] *Id.*

[111] Defendant's response to Plaintiff's first set of interrogatories, response to interrogatory No. 14, Exh. G-14, 75 TTABVUE 77–78.

- May 7, 2014: Customer named Jenna wrote to Defendant through the contact form on brooklynbrewshop.com indicating she will be visiting Brooklyn Brewery when visiting New York.

- May 31, 2014: Customer named Patrick asked through contact form on brooklynbrewshop.com if Defendant was related to Brooklyn Brewery. He was informed Defendant is not.

- December 14, 2014: Prospective customer named Adam Trosky contacted Defendant through contact form on brooklynbrewshop.com asking for a coupon for a Beer Making Kit. Note was addressed to Brooklyn Brewery. He was informed Defendant is not affiliated and did not offer coupons.

- December 24, 2014: Customer Margaret Bayne contacted Defendant through contact form on brooklynbrewshop.com to request a replacement part. She referred to Defendant as Brooklyn Brewery. It is unknown which product she purchased.

- September 17, 2015: Customer named Kenny Espinal referred to Brooklyn Brewery's Summer Ale through contact form on brooklynbrewshop.com.

- September 28, 2015: Craft Beer Cellar buyer (Chris Lazzery) declined to carry co-branded product because Plaintiff does not distribute in that state. Was informed Defendant is not affiliated.

- October 1, 2015: Fodor's Sales Assistant (Katelyn Connor) asked if Defendant would like to sell new Fodor's publication in Brooklyn Brewery gift shop.

- December 1, 2015: Customer Alan Cementina contacted Defendant through contact form on brooklynbrewshop.com attempting to use a coupon code intended for brooklynbrewery.com on Defendant's website.

- January 7, 2016: Customer of Brooklyn Brewery asked through Defendant's contact form at brooklynbrewshop.com to process a return for items possibly purchased at brooklynbrewery.com.

- February 25, 2016: Customer Michael Magnani referred to Defendant as Brooklyn Brewery when she contacted Defendant through contact form on brooklynbrewshop.com

- March 7, 2016: Customer Maikel van der List asked Defendant if additional ingredients needed to be purchased at Brooklyn Brewery.

In addition, Defendant identified four vendors that "referred to [Defendant] as 'Brooklyn Brewery' in internal emails" nine times between July 2011 and August 2015.[112]

Plaintiff introduced via a notice of reliance a number of emails produced by Defendant during discovery. The emails summarized below are most relevant:

- An email chain dated September 2011 between one of Defendant's employees and a Whole Foods employee discussing selling beer making kits. In one of the emails, Defendant's employee states: "We are not Brooklyn Brewery (even though we get a lot of their mail, and vice versa!), and do not produce any alcohol ourselves. Our one-gallon beer making kits classify as a food item . . . ."[113]

- An email chain dated March 2, 2012 between one of Defendant's employees and an employee of Country Malt. In response to receiving an invoice intended for Brooklyn Brewery, Defendant's employee states: "Sorry, but this is an invoice for Brooklyn Brewery as opposed to Brooklyn Brew Shop. You are not the first person to make this mistake, nor will you be the last, but our order was for 66 lbs. of hallertau tradition [hops]."[114]

- An email chain dated April 2013 between Erica Shea, one of Defendant's principals, and a book publisher discussing titles for one of Defendant's beer brewing books. In response to one of the suggestions, Ms. Shea states "we are already confused with Brooklyn Brewery entirely too much."[115]

- An email chain dated May 2014 between Defendant and one of Defendant's customers who is seeking help after mistakenly using a Brooklyn Brewery coupon code for an order being placed on Defendant's website.[116]

- An email chain dated December 2013 between Erica Shea and an employee of Elle.com regarding its online "gift guide" which listed Defendant as Brooklyn Brewery. Ms. Shea states "Elle.com put us in their gift guide –

---

[112] *Id.*

[113] Plaintiff's confidential notice of reliance, exh. H-5, 80 TTABVUE 47–54.

[114] *Id.*, exh. H-6, 80 TTABVUE 55–57.

[115] *Id.*, exh. H-9, 80 TTABVUE 63–65.

[116] *Id.*, exh. H-15, 80 TTABVUE 88–90.

but as Brooklyn Brewery – if you can talk to them on Monday about fixing that that would be great . . ."[117]

- An email chain dated August 2015 between one of Defendant's employees and a supplier discussing boxes for beer making kits. In the subject line of the email, the supplier has misidentified Defendant as Brooklyn Brewery.[118]

- An email chain dated November 2015 between Defendant and one of its customers who is seeking help after mistakenly attempting to use a Brooklyn Brewery coupon code for an order being placed on Defendant's website.[119]

### ii. Evidence from Plaintiff

Plaintiff also introduced testimony from several of its employees regarding instances of purported actual confusion. The following testimony is the most relevant:

1. Declaration of Glenn Severance[120]

Severance, Plaintiff's Point of Sale Manager, testified he had not heard of Brooklyn Brew Shop until the summer of 2011 when he was asked to look into hiring Brooklyn Brew Shop to make two beer-making kits.[121] Severance stated that the first co-branded beer-making kits were "only available on [Brooklyn Brewery's] website and in our store in Brooklyn. . . . The kits were simply listed on our website and in our store as 'Steve Hindy Edition beer making kits.'"[122] Severance further testified as follows regarding public confusion between the parties:[123]

---

[117] *Id.*, exh. H-18, 80 TTABVUE 96–97.

[118] *Id.*, exh. H-19, 80 TTABVUE 98–99.

[119] *Id.*, exh. H-21, 80 TTABVUE 106–09.

[120] Public Version 64 TTABVUE; Confidential Version 65 TTABVUE.

[121] Severance Dec., ¶ 4, 64 TTABVUE 2–3.

[122] *Id.* at ¶ 5, 64 TTABVUE 3.

[123] *Id.* at ¶¶ 7–9, 64 TTABVUE 2–3.

7. The front desk personnel at Brooklyn Brewery have forwarded calls and emails to me from people who think we are Brooklyn Brew Shop. I have fielded approximately several calls and read approximately 10 such emails.

8. Some callers complain that a beer kit is missing a component or the instructions. Other callers ask how they can order a specific beer kit or beer kit supplies like malt and hops and some callers ask for help with an order for beer kits that they placed with us.

9. I ask these callers what beer kit they have and they often respond with Everyday IPA or a grapefruit-flavored beer. I tell them that we do not make those products and that they are made by Brooklyn Brew Shop which is an unrelated company, and I refer them to brooklynbrewshop.com. If callers ask about home-brewing supplies for beer kits, I respond that we do not sell home brewing supplies and that they are probably thinking of Brooklyn Brew Shop. Sometimes callers respond that the Brooklyn Brewery and Brooklyn Brew Shop sound the same to them and that we must get calls like this all the time.

Exhibits to the Severance Declaration included eight email chains between December 2012 and May 2017 in which customers and others asked Brooklyn Brewery about problems with beer-making kits or their inability to buy beer making supplies on Plaintiff's website.[124]

2. Declaration of Daniel D'Ippolito[125]

D'Ippolito, Plaintiff's former Communications Coordinator, testified that between 2010 and 2012 he "frequently read and responded to emails that were sent to info@brooklynbrewery.com by customers about beer kits they insisted they had purchased from us. Customers would complain about a missing or non-functioning

---

[124] Exh. B-3 to Severance Dec., 65 TTABVUE 10–12.

[125] 66 TTABVUE.

component and request that we provide a new component or new kit."[126] D'Ippolito further testified that around 2011 or 2012 Plaintiff included a question and answer about beer-making kits in its online "Frequently Asked Questions" (FAQ) web page. The answer addressed questions about problems with beer-making kits and directed customers to Brooklyn Brew Shop's web page.[127] The FAQ has since been removed.[128]

   3.   Declaration of Alyson Deppa[129]

Deppa, Plaintiff's Assistant Controller, testified that between 2010 and 2013 she "received at least 20 calls from people asking about a product that is used to brew beer at home, such as malt or hops that they thought we sold. I would respond that we did not sell home brewing supplies. The caller would typically respond that he or she had seen the product advertised on our website."[130]

   4.   Declaration of Joseph Thompson[131]

Thompson, Plaintiff's employee, testified that between January 2014 and February 2015 he received "an average of 3–4 telephone calls and 5–6 emails a month from individuals who believed we were Brooklyn Brew Shop."[132]

---

[126] D'Ippolito Dec., ¶ 4, 66 TTABVUE 2.

[127] *Id.* at ¶¶ 8–9, 66 TTABVUE 3.

[128] *Id.* at ¶ 8, 66 TTABVUE 3.

[129] 67 TTABVUE.

[130] Deppa Dec., ¶ 4, 67 TTABVUE 2.

[131] 68 TTABVUE.

[132] Thompson Dec., ¶¶ 4–5, 68 TTABVUE 3.

5. Declaration of Jonathan Reyes[133]

Reyes, Plaintiff's employee, testified he has worked for Brooklyn Brewery since approximately 2015. He answers telephone calls and reads emails received by the brewery. Reyes states that he has "fielded dozens of calls from customers who think that Brooklyn Brewery is Brooklyn Brew Shop."[134] Many of these calls involve products that Plaintiff does not sell such as "Everyday IPA" and "Chestnut Brown Ale" beer-making kits, and more recently, hard-cider making kits.[135] Reyes also authenticated several emails "from consumers who believe we were the manufacturer of Brew Shop's beer kits,"[136] as well as several pieces of mail addressed to Defendant that were misdelivered to Plaintiff.

6. Declaration of Sarah Blumenthal[137]

Blumenthal, Plaintiff's Operations Coordinator, testified she has worked at Brooklyn Brewery since mid-2016.[138] Previously, she worked at Brooklyn Brew Shop from June 2015 to May 2016 where she was an operations assistant.[139] Blumenthal testified that while working for Defendant, each month she "fielded numerous

---

[133] 69 TTABVUE.

[134] Reyes Dec., ¶ 4, 69 TTABVUE 2.

[135] *Id*. at ¶¶ 8 and 10, 69 TTABVUE 3–4.

[136] *Id*. at ¶¶ 12 and 13, 69 TTABVUE 4–5.

[137] 70 TTABVUE.

[138] Blumenthal Dec., ¶ 2, 70 TTABVUE 2.

[139] *Id*. at ¶ 3, 70 TTABVUE 2.

telephone calls from [shipping] brokers who expressed the belief that we were Brooklyn Brewery or connected with Brooklyn Brewery."[140]

### 7. Deposition of Eric Ottaway

Ottaway, Plaintiff's CEO, admitted that he was "not aware of any instances of confusion before the Hindy [co-branded] kits started to be sold[.]"[141]

### iii. Analysis

We have carefully considered Plaintiff's evidence regarding alleged instances of actual confusion. We find it has significant shortcomings. The foremost problem is that much of the alleged confusion occurred during the period when the parties were actively promoting their co-branded beer-making kits. As discussed above, between early 2012 and 2016, the parties sold two co-branded kits and participated in a number of public events in order to promote sales of the kits. The first such kit, enlarged below, shows both parties' marks on the kit box, with Plaintiff's BROOKLYN BREWERY mark above Defendant's BROOKLYN BREW SHOP mark.

---

[140] *Id.* at ¶ 4, 70 TTABVUE 2–3.

[141] Ottaway dep, p. 125, 92 TTABVUE 128.



All but three examples of purported actual confusion produced by Defendant in response to Plaintiff's interrogatories occurred during the period when the parties were marketing co-branded kits.[142] Many of the other statements regarding possible confusion from Defendant's employees occurred during this period as well.[143]

Most of the testimony from Plaintiff's employees also occurred during the period when the parties were marketing co-branded kits, including the period from early 2012 to 2014 when Plaintiff was selling the first co-branded kit on its website.[144] For example, Thompson, Reyes, and Blumenthal all testified to events after 2012, when

---

[142] Defendant's response to Plaintiff's first set of interrogatories, response to interrogatory No. 14, Exh. G-14, 75 TTABVUE 77–78.

[143] *See* Plaintiff's confidential notice of reliance, 80 TTABVUE.

[144] Severance Dec., ¶ 4, 64 TTABVUE 2–3.

the first co-branded kit went on sale. Similarly, the Severance Declaration included eight email chains between December 2012 and May 2017 involving possible consumer confusion about beer-making kits and supplies, but all of these emails occurred after the co-branded kits went on sale.[145] Deppa testified she received "at least 20 calls" between 2010 and 2013 involving possible consumer confusion, but didn't clarify whether the calls occurred during the time that Plaintiff was selling the first co-branded kit on its website.[146] D'Ippolito testified that he "frequently read and responded to" emails involving possible consumer confusion during the period from 2010 to 2103, and indicated that some of the emails were received before the co-branded kits were produced, but this testimony is weakened because D'Ippolito didn't indicate how many emails were received or when they were received.[147]

Given the parties' co-branding of beer-making kits and joint participation in numerous marketing events, it is hardly surprising that consumers could have been confused as to whether the parties were affiliated in some way. The parties were in fact affiliated by virtue of marketing and selling the co-branded beer-making kits. Even if sales of these co-branded kits were small, as Plaintiff alleges, we cannot discount the possibility that confusion could have stemmed from the parties' joint sales and promotional efforts, beginning in early 2012 and continuing into mid-2016.[148] Further, consumers who may have been confused about different kits—those

---

[145] Exh. B-3 to Severance Dec., 65 TTABVUE 10–12.

[146] Deppa Dec., ¶ 4, 67 TTABVUE 2.

[147] D'Ippolito Dec., ¶ 4, 66 TTABVUE 2.

[148] Severance Dec., p. 2, 64 TTABVUE 3; Exh. B-1, 65 TTABVUE 2–7.

not co-branded by the parties—or other products may nevertheless have been confused by earlier exposure to the co-branded kits or to joint marketing efforts. *See Sebastian Int'l, Inc. v. Longs Drug Stores Corp*., 53 F.3d 1073, 34 USPQ2d 1720 (9th Cir. 1995) (plaintiff that placed collective mark on its products was primarily responsible for any confusion that resulted, and that confusion cannot be used to support a charge of infringement against defendant); *see also Sega Enters. Ltd. v. Accolade, Inc*., 977 F.2d 1510, 24 USPQ2d 1561, 1574 (9th Cir. 1992) (plaintiff, whose software displays its trademark when others' software used, is primarily responsible for any resultant confusion). Moreover, even if some instances of alleged consumer confusion did not stem directly from purchases of the co-branded kits, we cannot discount the possibility that these consumers were nevertheless impacted in some way by the marketing of the kits.

Simply put, although some customers may have been confused as to whether the companies were affiliated, they cannot have been confused as to the source of the goods because both parties were in fact the source of the goods. Accordingly, Plaintiff's evidence from 2012 and later does not establish actual confusion among consumers.

Regarding evidence of alleged actual confusion before 2012, we find much of the evidence is infirm or inconclusive. Plaintiff's CEO admitted he was not aware of any confusion prior to an internal investigation of the issue in 2015.[149] Additionally, many of the instances of alleged confusion are not from consumers, distributors or retailers, and thus are irrelevant. For example, misattribution in 2011 by Craftbeer.com of a

---

[149] Ottaway Dec., ¶ 26, 60 TTABVUE 8.

beer-flavored ice cream, to Plaintiff instead of Defendant, is not an example of consumer confusion.[150] Similarly, an email from an online adult education group seeking to launch a beer making class, addressed to Defendant but referring to Plaintiff, also is not an example of consumer confusion.[151] *See Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 94 USPQ2d 1866, 1870 (11th Cir. 2010) ("Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight while confusion of actual customers of a business is worthy of substantial weight.") (citation omitted); *see also* MCCARTHY, § 23:13 ("Obviously, the evidence of actual confusion is the testimony of a 'reasonably prudent purchaser' who was in fact confused by defendant's trademark."). Regarding the remaining few emails of alleged consumer confusion, given that Plaintiff sells its beer to millions of consumers and likely receives a large volume of email, we find the number to be insufficient to establish actual confusion.

As to the averments in the declarations of Plaintiff's employees about telephone calls from consumers, we note that none of the purportedly confused individuals—Plaintiff's customers, suppliers, or others—testified about their confusion. Rather, there is only conclusory testimony from Plaintiff's employees. Courts and leading trademark treatises consistently note that relatively imprecise averments of employees of parties in whose interest it is to prove confusion that the employees

---

[150] Defendant's response to Plaintiff's first set of interrogatories, response to interrogatory No. 14, Exh. G-14, 75 TTABVUE 77–78.

[151] Plaintiff's Notice of Reliance Exh. H-7, 80 TTABVUE 58–60.

have dealt with confused consumers is, without further corroboration, generally not entitled to much weight. *See, e.g.*, *Vitek Sys., Inc. v. Abbott Labs.*, 675 F.2d 190, 216 USPQ 476, 479-80 (8th Cir. 1982) (factfinder could refuse to credit uncorroborated testimony of interested persons about interacting with unspecified confused consumers); *see also Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 38 USPQ2d 1937, 1941 (8th Cir. 1996); A. Gilson Lalonde, 5 GILSON ON TRADEMARKS § 5.04[4][c] ("[W]here the evidence of actual contemporaneous confusion is filtered through a plaintiff's employees or where people affiliated with the plaintiff proclaim their confusion, courts are rightly wary of the possibility of bias and view such evidence with skepticism"); *id.* n.44 (collecting cases). We do not see any reason to give those declarations more weight here. If there had been corroboration of some sort of the mostly-generalized instances recounted by Plaintiff's employees, we might have given these averments more weight. But there was not. And, as noted above, many instances of telephone calls with purported actual confusion occurred during the period of co-branded beer-making kits.

Finally, several instances of purported confusion are inquiries as to whether the companies are related.[152] These do not demonstrate confusion; rather they demonstrate that the individuals understand that the companies may be different entities. *See, e.g.*, *Mini-Melts, Inc. v. Reckitt Benckiser LLC*, 118 USPQ2d 1464, 1475 (TTAB 2016); *Couch/Braunsdorf*, 110 USPQ2d at 1479 (inquiry is not evidence of

---

[152] *See, e.g.,* Defendant's response to Plaintiff's first set of interrogatories, response to interrogatory No. 14, Exh. G-14, 75 TTABVUE 77–78.

confusion because the inquiry indicates that the prospective customer had a reason to suspect that there were two different companies); *Marshall Field & Co. v. Mrs. Fields Cookies*, 25 USPQ2d 1321, 1334 (TTAB 1992) (inquiries indicate that people were aware that MARSHALL FIELD'S and MRS. FIELDS were different entities and none of the persons were called as a witness and questioned about the reasons for their inquiries); *Toys "R" Us, Inc. v. Lamps "R" Us*, 219 USPQ 340, 346 (TTAB 1983) ("The fact that questions have been raised as to the possible relationship between firms is not by itself evidence of actual confusion of their marks."); *Elec. Water Conditioners, Inc. v. Turbomag Corp.*, 221 USPQ 162, 164 (TTAB 1984) ("That questions have been raised as to the relationship between firms is not evidence of actual confusion of their trademarks.").

In sum, the evidence occurring during the co-branding period is not evidence of actual confusion and the remaining examples are too infirm to constitute evidence upon which we may accord sufficient probative value to make a finding of actual confusion. In view thereof we find the seventh and eighth *DuPont* factors to be neutral.[153]

**E. Balancing the *DuPont* factors as to classes 5 and 21**

We have considered all of the arguments and evidence of record, including any not specifically discussed herein, and all relevant *DuPont* factors. Defendant's BROOKLYN BREW SHOP mark is similar in appearance, sound, connotation, and

---

[153] Even if we were to find the record includes some examples that could be considered to be instances of actual confusion, they are too few in number that we would still find these factors to be neutral in the overall weighing of the relevant *DuPont* factors.

commercial impression to Plaintiff's BROOKLYN BREWERY and BROOKLYN marks. Although the marks are not identical, marks must be considered in light of the fallibility of memory. *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014). While Plaintiff's marks have some conceptual weakness, they also have some commercial strength. The differences between the marks are minor and could be overlooked or misremembered. Some of the goods, namely, beverage glassware, are legally identical.

We find that as to the beverage glassware in class 21, the similarity of the marks, despite some weakness in Plaintiff's marks, and the legal identity of the goods, are such that Defendant's mark, as used in connection with beverage glassware, so resemble Plaintiff's marks as to be likely to cause confusion or to cause mistake or to deceive. On the other hand, we find that the dissimilarity of the goods and channels of trade for Defendant's sanitizing preparations are so great that these factors outweigh the similarity of the marks and do not support concluding that confusion is likely.

## F. Inevitable confusion as to class 32

Defendant has established the defenses of laches and acquiescence as to beer-making kits in Class 32 in both its registration and application. Accordingly, for Plaintiff to prevail, it must establish that confusion is inevitable.[154] The standard for finding confusion to be inevitable (versus only "likely") is a higher one: "[T]he

---

[154] Defendant's consent to entry of judgment on the question of likelihood of confusion in the '776 application with respect to the deleted goods in Class 32, which included beer making ingredients, does not necessitate a finding that confusion is inevitable as to beer making kits.

standard of confusion required for a finding of inevitability of confusion is an increment higher than that required for a finding of a likelihood of confusion." *Coach House*, 19 USPQ2d at 1409; *see also Turner*, 52 USPQ2d at 1313 n.5.

Generally, confusion has been found to be inevitable where the respective marks and goods or services are identical or nearly so. *See, e.g.*, *Metro Traffic Control, Inc. v. Shadow Network Inc.*, 104 F.3d 336, 41 USPQ2d 1369, 1373 (Fed. Cir. 1997) (affirming Board finding that confusion was "so likely that it is virtually inevitable, because the parties are using the identical mark for the identical services") (internal citation omitted); *Ultra-White*, 175 USPQ at 167 (confusion inevitable for nearly identical BRIGHT WHITE and BRIGHTWHITE marks for laundry products). *But see Teledyne*, 78 USPQ2d at 1212 (finding confusion likely but not inevitable where the parties' marks were identical but the goods, although commercially related, were "hardly identical").

We find the evidence of record does not establish that confusion is inevitable as to Defendant's beer-making kits. Plaintiff's marks, BROOKLYN and BROOKLYN BREWERY, and Defendant's BROOKLYN BREW SHOP marks are not identical. More importantly, the goods are not identical either inasmuch as Plaintiff's goods do not include beer-making kits. The goods may be commercially related but they are "hardly identical." *Teledyne*, 78 USPQ2d at 1212. We do not find the instances of asserted actual confusion sufficient to establish that confusion is inevitable. Moreover, the statement by Plaintiff's CEO, Eric Ottaway, regarding the marks' ability to co-exist is particularly relevant: "While we have no problem with the beer

making kit side, we do have a problem with the beer category."[155] If Plaintiff's CEO has "no problem" with Defendant's use of BROOKLYN BREW SHOP on beer-making kits, confusion is not inevitable as to the kits.

### G. Conclusion

Plaintiff's likelihood of confusion claims as to beer-making kits in class 32 in the '439 registration and the '776 application, as amended, are dismissed. The likelihood of confusion claim as to sanitizing preparations in class 5 of the '776 application is likewise dismissed. The likelihood of confusion claims as to the glassware and coasters in class 21 in the '776 application are sustained.

## VII.   Mere descriptiveness under Trademark Act Section 2(e)(1)

We next address Plaintiff's claim that Defendant's BROOKLYN BREW SHOP mark in the '439 registration is merely descriptive under Trademark Act Section 2(e)(1) of the Trademark Act. Defendant's equitable defenses of laches and acquiescence are not available against claims of descriptiveness. *See Saint-Gobain*, 66 USPQ2d at 1359. Plaintiff bears the burden of showing, by a preponderance of the evidence, that the designation sought to be registered is merely descriptive. *Goodyear Tire & Rubber Co. v. Cont'l Gen. Tire Inc.*, 70 USPQ2d 1067, 1070 (TTAB 2003).

Section 2(e)(1) of the Trademark Act precludes registration of "a mark which, (1) when used on or in connection with the goods of the applicant is merely descriptive . . . of them." 15 U.S.C. § 1052(e)(1). "A mark is merely descriptive if it immediately conveys information concerning a feature, quality, or characteristic of the goods or

---

[155] Exh. 202 to Valand Dec., 86 TTABVUE 32, 90 TTABVUE 179–80.

services for which registration is sought." *Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*, 906 F.3d 965, 128 USPQ2d 1370, 1373 (Fed. Cir. 2018) (quoting *In re N.C. Lottery*, 866 F.3d 1363, 123 USPQ2d 1707, 1709 (Fed. Cir. 2017)). Descriptiveness of a mark must be assessed "in relation to the goods for which registration is sought, the context in which it is being used, and the possible significance that the term would have to the average purchaser of the goods because of the manner of its use or intended use." *In re Bayer AG*, 488 F.3d 960, 82 USPQ2d 1828, 1831 (Fed. Cir. 2007) (citing *Abcor*, 200 USPQ at 218). The descriptiveness analysis concentrates on the recitation of goods set forth in the application. *See In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1636 (Fed. Cir. 2016) (quoting *Octocom Sys., Inc. v. Houston Comput. Servs., Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990)).

Evidence that a term is merely descriptive to the relevant purchasing public "may be obtained from any competent source, such as dictionaries, newspapers, or surveys." *Bayer*, 82 USPQ2d at 1831; *see In re Virtual Indep. Paralegals, LLC*, 2019 USPQ2d 111512, at \*2 (TTAB 2019) ("Evidence of the public's understanding of a term may be obtained from 'any competent source, such as ... dictionaries, newspapers and other publications.'") (quoting *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 114 USPQ2d 1827, 1830 (Fed. Cir. 2015)).

Plaintiff argues "BROOKLYN BREW SHOP is merely descriptive and/or primarily geographically descriptive of the goods."[156] As addressed above, Plaintiff did not plead that Defendant's mark was primarily geographically descriptive and a

---

[156] Plaintiff's Br., p. 27, 103 TTABVUE 28.

determination of this claim is not before the Board. Regarding the individual terms in Defendant's mark, Plaintiff argues "[t]he first word in Applicant's mark is BROOKLYN, a well-known geographic location"[157] and Defendant is based in Brooklyn. Continuing, Plaintiff argues "[t]he term BREW SHOP in Applicant's mark merely describes a type of business that sells brewing supplies such as brew kits."[158] Plaintiff observes that "Applicant voluntarily disclaimed BROOKLYN in the application that matured into the '439 registration, thus admitting it is primarily geographically descriptive of the goods."[159]

We agree the primary significance of the term "Brooklyn" is, without question, geographic. And the term BREW SHOP describes a "place to buy brewing supplies."[160] The addition of BREW SHOP to BROOKLYN, moreover, does not obviate a determination that BROOKLYN BREW SHOP refers to a place to buy brewing supplies in Brooklyn. *See In re Cambridge Dig. Sys.*, 1 USPQ2d 1659, 1662 (TTAB 1986) (the addition of generic or highly descriptive terms to a geographic term does not preclude a determination of geographical descriptiveness).

For these reasons, it seems likely Defendant's marks would not be perceived by the prospective customers seeking brewing supplies and accessories as describing a "quality, feature, function, or characteristic" of the goods. Rather, we believe the phrase BROOKLYN BREW SHOP primarily signifies a "brew shop" based in

---

[157] *Id*. at 28, 103 TTABVUE 29.

[158] *Id*. at 29, 103 TTABVUE 30.

[159] *Id*. at 28, 103 TTABVUE 29.

[160] Erica Shea Dep., p. 38, 51 TTABVUE 39.

Brooklyn and that, with respect to the brewing supplies and accessories, a public association of those goods with the geographic place named in Defendant's mark (i.e. Brooklyn) may be presumed. *See In re BankAmerica Corp.*, 231 USPQ 873 (TTAB 1986) (phrase BANK OF AMERICA primarily geographically descriptive of computerized financial data processing services but not merely descriptive of such services).

All of Plaintiff's arguments inform whether BROOKLYN BREW SHOP is primarily geographically descriptive under Section 2(e)(2), not whether it is merely descriptive under Section 2(e)(1). Showing that Brooklyn describes the geographic origin of the goods or the location of Defendant's "brew shop" is not sufficient to justify a refusal of registration under Section 2(e)(1). Accordingly, Plaintiff's claim under Trademark Act Section 2(e)(1) for cancellation of the '439 registration is denied. *See In re Joint-Stock Co. "Baik"*, 80 USPQ2d 1305, 1311 (TTAB 2006) ("Showing that BAIKALSKAYA describes the geographic origin of an ingredient of the goods is not sufficient to make out a separate basis for refusal under Section 2(e)(1).").

Since Plaintiff's claim under Trademark Act Section 2(e)(1) fails, we need not consider whether the mark lacked acquired distinctiveness at the time of registration.

**Decision**: The opposition to Application Serial No. 86280776 is sustained as to class 21, and registration is refused as to this class.

The opposition is dismissed as to class 5 and class 32, as amended, and the application will proceed as to these classes only.

The petition for cancellation of Registration No. 4034439 is denied.